WHEELER *v.* TRADERS' INSURANCE CO.

Under a stipulation that insurance shall immediately cease if the assured uses naphtha, the insurance ceases when his use of naphtha involves the insured property in a substantial naphtha risk.

ASSUMPSIT, on a policy of insurance on the plaintiff's woollen mill and contents, which were burned May 23, 1879. Facts agreed. The policy contains the following stipulation: "If the assured shall keep or use gunpowder, fireworks, nitro-glycerine, phosphorus, saltpetre, nitrate of soda, petroleum, naphtha, gasoline, benzine, benzole, or benzine varnish, or keep or use camphene, spirit gas, or any burning fluid or chemical oils, without written permission in this policy, then and in every such case this policy is void, and all insurance thereunder shall immediately cease and determine."

Benzine and naphtha are of three grades, differing according to the degree of lightness, and the words are often used interchangeably. Benzine readily evaporates when exposed to the air, passing off in a gas. This gas is heavier than air, and will fall rather than rise, if there are no currents to disturb it. It can be poured from one vessel to another. It is not in itself explosive, and unmixed with air does not readily ignite. If mixed with air, it is explosive and very inflammable. It passes through crevices and holes more readily than water. The quantity of gas produced is five hundred or six hundred times greater than the fluid which produced it. A quart of benzine poured on the floor would evaporate in a few minutes. A small dishful placed at the top of stairs could soon be ignited at the bottom, though it could not be above the dish.

The fire broke out about noon. In the morning there was a fire under the boiler to heat the dye vats to 140° or 150°. The fire was made of pine wood, and was not replenished after about nine o'clock. About eleven o'clock, the plaintiff, for the purpose of killing moths in some wool, carried into the mill a barrel of naphtha, drew some of the liquid several times into a watering-pot holding about two quarts, and sprinkled it upon the wool at the opposite end of the room from the cask. The fire broke out

about thirty feet from the wool, and spread rapidly to it. Nothing more is known of the origin of the fire. The plaintiff bought the naphtha (supposing it to be benzine, which he had ordered) for use in destroying the moths, and he intended to remove it from the building after sprinkling the wool, and use it in cleaning the windows, which were to be taken out of the mill for that purpose.

*Marston & Eastman* and *J. S. H. Frink*, for the plaintiff. Keeping or using naphtha implies an habitual or continuous act, not an occasional or single one. *Dobson* v. *Sotheby*, 1 Moody & M. 90; *Mears* v. *Humboldt Ins. Co.*, 92 Pa. St. 15; *Williams* v. *N. Eng. Ins. Co.*, 31 Me. 223; *Williams* v. *F. Ins. Co.*, 54 N. Y. 569; May Ins., *s.* 241; Webster's Dictionary.

*S. C. Eastman*, for the defendants. The rule stated in *Glen* v. *Lewis*, 8 Exch. 607 (1853), is the present English law; and the earlier cases, *Dobson* v. *Sotheby*, 1 Moody & M. 90 (1827), and *Shaw* v. *Robberds*, 6 A. & E. 75 (1837), have not been understood to establish a different one. One or both of the earlier cases are cited in *Mayall* v. *Mitford*, 6 A. & E. 670 (1837); *Quin* v. *Nat. Ins. Co.*, 1 J. & C. 316 (1839); *Faulkner* v. *Cen. Ins. Co.*, 1 Kerr 279 (1841); *Grant* v. *Howard Ins. Co.*, 5 Hill N. Y. 10 (1843); *Pim* v. *Reid*, 6 Man. & Gr. 1; *Jennings* v. *Ch. Ins. Co.*, 2 Denio 75 (1846); *Boardman* v. *N. H. Ins. Co.*, 20 N. H. 551 (1847); *Barrett* v. *Jermy*, 3 Exch. 535 (1849); *Billings* v. *Toll. Ins. Co.*, 20 Conn. 139; *O'Niel* v. *B. Ins. Co.*, 3 N. Y. 122; *Williams* v. *N. Eng. Ins. Co.*, 31 Me. 219 (1850); *Clark* v. *Man'f'rs' Ins. Co.*, 8 How. 235; *Gates* v. *M. Ins. Co.*, 5 N. Y. 469 (1851); *Wall* v. *E. R. Ins. Co.*, 7 N. Y. 370 (1852); *H. P. Ins. Co.* v. *Harmer*, 2 Ohio St. 452 (1853); *Foye* v. *Ætna Ins. Co.*, 3 Allen (N. B.) 29 (1854); *Loud* v. *C. Ins. Co.*, 2 Gray 221; *Lee* v. *How. Ins. Co.*, 3 Gray 583; *Sillem* v. *Thornton*, 3 E. & B. 868; *Miller* v. *W. Ins. Co.*, 1 Handy 209; *Stokes* v. *Cox*, 1 H. & N. 320 (1856); *Macomber* v. *How. Ins. Co.*, 7 Gray 257; *Leggett* v. *Ætna Ins. Co.*, 10 Rich. 202; *Vogel* v. *Peo. Mut. Ins. Co.*, 9 Gray 23 (1857); *Girard Ins. Co.* v. *Stephenson*, 37 Pa. St. 293 (1860); *Mayor* v. *Ham. Ins. Co.*, 10 Bosw. 537 (1863); *Lyman* v. *State Mut. Ins. Co.*, 14 Allen 330 (1867); *Gove* v. *F. Ins. Co.* 48 N. H. 41 (1868); *Mickey* v. *Bur. Ins. Co.*, 35 Iowa 174 (1872); *Mears* v. *Hum. Ins. Co.*, 92 Pa. St. 15 (1879). *Worcester* v. *W. Ins. Co.*, 9 Gray 27, and *Wetherell* v. *City Ins. Co.*, 16 Gray 276, agree with the other Massachusetts cases.

*Duncan* v. *Sun Ins. Co.*, 6 Wend. 488 (tried in 1829 and decided by the supreme court in 1831), *Langdon* v. *N. Y. Eq. Ins. Co.*, 1 Hall 226 (1828) and 6 Wend. 623, and *Delonguemare* v. *T. Ins. Co.*, 2 Hall 589, have been followed in New York and some other states, and *Dobson* v. *Sotheby* and *Shaw* v. *Robberds* have been cited as sustaining their definitions. *City Ins. Co.* v. *Corlies*, 21

Wend. 367 (1839); *Grant* v. *How. Ins. Co.*, 5 Hill N. Y. 10
(1843); *O'Niel* v. *B. Ins. Co.*, 3 N. Y. 122 (1849); *Gates* v. *M.
Ins. Co.*, 5 N. Y. 469 (1851); *Wall* v. *E. R. Ins. Co.*, 7 N. Y. 370
(1852); *Williams* v. *F. Fund Ins. Co.*, 54 N. Y. 569 (1874); *Raf-
ferty* v. *N. B. Ins. Co.*, 18 N. J. Law 480 (1842); *Moore* v. *Pro.
Ins. Co.*, 29 Me. 97 (1848).

There is a class of cases in which warranties have been held to
be modified by the description of the thing insured, or of the trade
carried on, it having been held in some jurisdictions that essential
or customary parts of a stock in trade, or essential or customary
use in a process which was expressly recognized, constitute an
exception to the general prohibition.   The general language of
the stipulations has been succeeded by the particular language of
this policy, and that, too, doubtless for the express purpose of
responding to the suggestion thrown out by the courts in the early
cases.   This policy does not provide, as in *Dobson* v. *Sotheby*,
against "storing," nor, as in *Shaw* v. *Robberds*, against a change
of trade.   The words are "keep or use;" and the articles objected
to are not classed, but named specifically.   The words used are
not in any sense technical; they are words of every-day use,
which the most unlettered layman would readily understand.   It
is true, that, by a majority of the court, it was held in New York
that "keeping" and "storing" are nearly synonymous.   *Hynds* v.
*S. Ins. Co.*, 11 N. Y. 554.   It is admitted that "keeping" was intro-
duced after and in consequence of the decision in *N. Y. Eq. Ins.
Co.* v. *Langdon*, but they say that it was meant to apply to goods
kept for retail which are not covered by "storing."   The policy
there suspends the operation of the contract so long as the prem-
ises are "appropriated, applied to, or used for the purpose of either
storing or keeping."   The language of the case at bar is more def-
inite, so that the decision, if binding, would not be conclusive.
So, in like manner, in *Mears* v. *Hum. Ins. Co.*, 92 Pa. St. 15, it is
held that there is no difference between "keep" and "have," and
that both together mean the same as "store."   This is an appli-
cation of language that would have surprised the judges, both in
England and in New York, who first set in motion the now accepted
definition of "store."   It is, moreover, contrary, though this is
denied by the court, to the ruling of the same tribunal in *Birming-
ham Ins. Co.* v. *Kroegher*, 83 Pa. St. 64.

Length of time is not necessary to constitute a keeping.   Thus,
on an indictment for keeping and maintaining a tenement used
for the sale and keeping of intoxicating liquors, the court instructed
the jury that "it would be sufficient to prove that the defendant,
even for an hour, had the charge or control of the premises as
clerk or agent of the proprietor."   *Com.* v. *Maroney*, 105 Mass.
467 note; *Com.* v. *Kimball*, 105 Mass. 465.

Where, in an application, questions are asked which are an-
swered truthfully as to then existing facts or as to habitual custom,

when the question is one which points to custom, though perhaps in terms more comprehensive, the courts have sometimes interlined limiting words if the application is made a part of the contract. *Williams* v. *N. E. Ins. Co.*, 31 Me. 219, is a case of this kind. The application, in answer to an inquiry as to heating, said, "No stoves." *Shepley*, C. J., says,—"The language of the interrogatory and answer had reference to the habitual use of stoves, and not to the temporary use of one for a purpose connected with the completion of the building." To this he cites *Dobson* v. *Sotheby* and *Shaw* v. *Robberds*. "The statement was true when made, and when considered as a contract or warranty that no stove should be used as they ordinarily or habitually are in dwelling-houses, continued to be true to the time of the loss." To the same effect is *Van Valkenburgh* v. *Am. Pop. Life Ins. Co.*, 70 N. Y. 605. The last case on this subject in New York, however, states the effect of a warranty more in accordance with the true construction. *Matson* v. *F. B. Ins. Co.*, 73 N. Y. 310. The defendants knew the dangerous nature of the article, and excepted it from the risk they were willing to assume. The language is plain. As is said in *Glen* v. *Lewis*, there is no case which establishes the law that will interpolate "habitual" except *Mears* v. *Hum. Ins. Co.*, and that is not justified or supported by the authorities, nor by the sound interpretation of the law.

Doe, C. J. Whether the expression "keep or use" means a keeping or use on a single occasion, or frequently repeated, or continued for several days or months, depends upon the subject-matter of the contract, and the intention of the parties proved by competent evidence. If the plaintiff had walked through his mill with a vial of naphtha in his pocket, the transit might not have involved the insured property in the danger which he had agreed should annul the policy. A drop of the liquid carried into the mill, and instantly used there as medicine, might create no appreciable hazard of fire. The policy covered certain risks; but the danger of fire where naphtha is kept or used is such that the defendants expressly refused to assume it, and the plaintiff agreed to at least as much as this,—that his keeping or using naphtha, if it involved the mill in substantial danger, should terminate the insurance. Whether his agreement is broader than that, we need not inquire.

Naphtha was several times drawn from the cask into a watering-pot holding about two quarts, carried across the room, and sprinkled upon the wool. Thus mixed with the air in a manner favorable to rapid evaporation, its bulk was quickly multiplied five or six hundred times, and it became explosive and very inflammable. Penetrating all sources of combustion, it flowed over the mill, and exposed it and its contents to imminent danger of destruction. Unaware of the dangerous nature of the material he

was using, the plaintiff put all the insured property in an enormous peril, which continued as long as the property existed.    He had agreed that if he should do this, the whole fire risk should be his, and not the defendants', and he does not contend that his ignorance of the hazardous character of his act is material.    In pursuance of his agreement the insurance ceased when the naphtha risk began.

There was no contract that the defendants should bear any risk a year or a day after he wittingly or unwittingly introduced such a danger as that which resulted from his use of naphtha.    If he had intended to use it every day for a year as he used it on the day of the fire, and the fire had been caused by its use a moment after the first act of sprinkling the wool, the policy would have been invalidated by the dangerous use, and not by the consequent fire.    It would not be material whether the fire started the first moment of the use intended to be continued a year, or the last moment of the year's actual use.    It was not a mere intention to use naphtha once or many times, nor a fire resulting from, or made irresistible, by its use, nor a naphtha risk prolonged an unreasonable time, but a use of naphtha exposing the property to substantial danger, that was to put an end to the defendants' liability.    "If the assured shall keep or use  .  .  .  naphtha,  .  .  . this policy is void, and all insurance thereunder shall immediately cease."    The immediate cessation of the insurance when the plaintiff used naphtha does not mean that under such a naphtha risk as enveloped the mill when the fire broke out, the insurance would continue down to the last moment of the undefined period at the expiration of which that risk would become a habit of the plaintiff, and a customary condition of the property.    On the facts stated, the plaintiff cannot recover.

*Case discharged.*

CARPENTER, J., did not sit: the others concurred.